JOHN LEE AND ELIZABETH LEE, Respondents, v. PUBLISHERS, GEORGE KNAPP & COMPANY, Appellant.

St. Louis Court of Appeals, December 5, 1893.

1. **Negligence:** LAW AND FACT. When the evidence in an action at law is conflicting, or warrants the deduction of different rational inferences, it is the province solely of the jury to reconcile it, or to determine which of these inferences is to be drawn from it. This rule is applied in this cause to issues in regard to the existence of negligence.

2. ———: INSTRUCTION AS TO PRESUMPTION. When in an action for damages for a physical injury there is substantial evidence of contributory negligence on the part of the person injured, it is error to instruct the jury that there is a legal presumption that he exercised ordinary care.

3. **Elevators:** STANDARD OF CARE REQUIRED OF OWNER. *Held,* in the course of discussion, that, in determining whether the owner of an elevator has exercised due diligence in making it reasonably safe for its intended uses, the usage of others is not the sole criterion, and that such diligence does not, as a matter of law, follow from the fact that the elevator is such as is ordinarily used for like purposes by reasonably prudent men.

*Appeal from the St. Louis Circuit Court.*—HON. JAMES E. WITHROW, Judge.

REVERSED AND REMANDED.

*A. & J. F. Lee* for appellant.

*Virgil Rule* and *A. R. Taylor* for respondents.

BOND, J.—This is an action by the parents for compensation for services of a child whose death was occasioned in the use of an elevator belonging to defendant.

The negligence alleged in the petition is: *First.* A defective and negligent construction of the elevator by reason of "an open space between the floor of said elevator car and the door of the elevator," of such dimensions as to "create a dangerous hole or trap into which the passengers upon said elevator were likely to fall." *Second.* "That in the running of said elevator it shook and was unsteady." *Third.* "In having in charge of said elevator an inexperienced person."

The answer was a general denial and a plea of contributory negligence. There was a verdict and judgment for $1,600 in favor of plaintiffs in the trial court, from which the defendant has appealed.

The errors assigned are: *First.* That the court should have sustained appellant's demurrer to the evidence. *Second.* That the court erred in giving the following instruction, viz.:

"The court instructs the jury that there is a legal presumption in this case that the deceased, Robert E. Lee, was in the exercise of ordinary care at the time of his injury and death, and the burden of proving to the satisfaction of the jury that said deceased was not exercising such care, before this case can be defeated on the ground of contributory negligence upon the part of the deceased, is upon the defendant."

The first assignment of error imposes upon us the duty of examining so much of the evidence as related to the construction of the elevator openings, its steadiness of operation, and the circumstances attending the accident to the son of plaintiffs.

The construction of the elevator, and its appearance when stopped at one of the five landings, is shown in the subjoined cut:

**A. ELEVATOR FLOOR.**
**B. HALL OR RECESS SPOKEN OF AS PLATFORM.**

The cage of the elevator is about six feet square; the entrance from the hall on each floor is through an opening sixteen and one-half inches deep, three feet wide and eight feet high.  This entrance has the form of a small hall of these dimensions, divided by a door from the larger halls on each floor of the building. There was an unprotected outlet from the elevator cage to this smaller hall, whenever the cage passed or stopped in front of said small hall.

With reference to the motion of the elevator cage during its operation, the evidence of the two witnesses for the appellant was that there was a lateral motion left in elevators of this sort, in order that the guides might not bind; that it was not considered a shaking elevator, and would not shake a man off. . The testi- mony of respondents' two witnesses on that point was a part of their evidence as to the accident.  Andrew Aylward, fourteen years old, a report boy of the Western Union Telegraph Company, knew the deceased boy for the two months that the latter had been delivering messages and associated press dispatches for the telegraph company, and was on the elevator with him on the night of his death.  This witness on direct examination said:  "Me and the elevator boy and this little Lee boy was going up in the elevator, and this little Lee boy was standing in a small corner.  Any- body could fall out of it, it is so small; it is about that wide (indicating).  There was no part of the elevator that wide.  He was standing in the corner, when he got in the elevator; I was in the next corner, the next opposite; the elevator boy was standing cater-cornered from me, and the little Lee boy, while the elevator was going up, he stepped off, I suppose."

"Q. State just what you saw?  A. I heard the little fellow holler.  I looked down and saw him with one

foot at the corner where he was standing; the rest of him on his face and hands.

*Q.* Where was he resting his face and hands? *A.* On the little platform that came in from the door.

*Q.* Where were his feet at the moment? *A.* On the elevator; one foot was on the elevator.

*Q.* What did you do? *A.* When he hollered, I looked there and saw his foot and made a grab for it, and just as I made the grab for it he went through the space and went to the bottom.

*Q.* Will you explain to the jury what you mean by this space, I mean the space when the elevator went up? *A.* It was that high from the platform of the door; he went through the space, he swung right through it.

*Q.* Illustrate it? *A.* I don't know what you mean by illustrate it.

*Q.* That is a fact, I am too lofty for you; explain to the jury how that space was made, the hole in which he fell? *A.* When the elevator goes up, passes the fourth floor, there is a space left, and anybody could fall out if he wanted to.

*Q.* How big is that space? *A.* When the boy fell, the space was about that high (indicating). * * * .

*Q.* As the elevator passed up the space, what, if anything, was there to prevent a person stumbling and falling off the elevator into space? *A.* In the first place, the door was too far back.

*Q.* You didn't see the boy at the time he fell? *A.* No, sir.

*Q.* As the elevator passed by the open space, with the elevator boy standing in the elevator, what was there to prevent him from falling into the open space if he lost his balance? *A.* I don't know.

*Q.* Did you know of anything? *A.* There was a platform coming from the door, that is all I know.
*' * *

*Q.* Show the jury how his body and his stomach were—his breast was resting? *A.* One of his feet was in the elevator, the elevator came right straight up, and it dropped him into the space from the door. Just as it dropped him, his other foot came off and he went right to the bottom, as soon as I made a grab.

*Q.* How far did he fall? *A.* From the fourth floor to the first.

*Q.* How did the elevator run? *A.* It used to shake when it would run.

*Q.* Could you describe to the jury how much it shook? *A.* I can't describe that.

*Q.* Did you ever ride on an elevator that shook as bad as that one? *A.* No, I never rode on any elevator that shook that way.

*Q.* What was the elevator boy doing at the time? *A.* The elevator boy was speaking to me.

*Q.* Do you remember what you were speaking about? *A.* No, sir.

*Q.* When your attention was called to the boy by the outcry, I will ask you whether his head, as he lay at that moment, was higher or lower than the floor of the elevator? *A.* It was lower.

*Q.* One of his legs you say was on the floor of the elevator? *A.* Yes, sir.

*Q.* Where were his hands? *A.* On the floor of the door, on the platform coming out from the door."

On cross-examination he said, upon inquiry as to his statement before the coroner, that he gave testimony there on the day following the accident, and told everything he knew about it, *and exactly as it occurred.* He also testified on cross-examination, to-wit: "*Q.* See if you remember this. Don't you remember that you said the little boy, Willie Lee, wanted to get off on the fifth floor, and, when he reached the fourth floor, he

thought he was on the fifth, and tried to get off—do you remember saying that? *A*. Yes, sir."

After stating that he did not remember certain other questions and answers, he was further interrogated as to his examination before the coroner, to-wit:

" '*Q*. Do you know how he came to fall? *A*. The elevator was going, and I suppose it turned it *(sic)* onto his face. The elevator was going up to the fifth floor, and, while the elevator was going, he walked right out of the elevator onto the fourth, and his foot got caught in one of the corners and he fell on his face; and the elevator kept going, and he gave a little hollo, and I made a grab for his foot and I tried to save him, but he was gone before I could.' Was that question put to you, and did you give that answer? *A*. I think I answered that question, I think I told the coroner that.

*Q*. You think you told him more than that? *A*. I think I told him what you read there.

*Q*. Now, I want to see if you remember this question? '*Q*. How fast was the elevator going? *A*. It ain't a very fast elevator, you can't make it go; the one on Third street could go up and down five times while that would be going up once; it is not a very fast elevator at all.' Did the coroner ask you that question, and did you give that answer? *A*. Yes, sir.

*Q*. Does that elevator always go slow? *A*. Yes, sir; you cannot make it go any faster. Did you say that too? *A*. Yes, sir."

Charles Willis, the elevator boy, sixteen years of age, testified in chief.

"*Q*. Now, describe that elevator to the jury; what kind of an elevator was it? *A*. It was a large, clumsy, shaky kind of a thing.

*Q.* To what extent would it shake? *A.* That I don't know, exactly; it has been so long since I was in it.

*Q.* At that time? *A.* That I don't know; it shook considerable anyway?

*Q.* Now, will you describe to the jury that space that would be by the side of the elevator as it passed these doors at the different stories? *A.* The way it was there, it would be a space of about three feet one way and about sixteen inches the other, cross-ways.

*Q.* About how high? *A.* Eight feet or seven and a half.

*Q.* About three feet wide? *A.* Yes, sir.

*Q.* And sixteen inches, in depth? *A.* Yes, sir.

*Q.* As the elevator floor passed this space, if a person on the elevator floor should fall or stumble, what was there to catch him, to prevent him going into this space? *A.* Nothing.

\* \* \* \* \* \* \* \* \*

*Q.* Tell the jury now the first thing you knew of the accident to the boy? *A.* The first thing I knew was when Willie hollowed. I stopped the elevator, and the little fellow, Andrew, was trying to get hold of Willie's foot; I could not get hold of it before he slipped off of the elevator and fell through the shaft, because Andrew was between me and Willie.

*Q.* Describe how he was when you first saw him after hearing him scream? *A.* I could not see anything of him but his foot and part of his leg.

*Q.* Where was his foot? *A.* Hanging on the elevator floor.

*Q.* His body protruded through the space in the door? *A.* Yes, sir.

*Q.* You didn't see him when he fell? *A.* No, sir.

*Q.* At the moment you saw the body in the position you have described to the jury, about how high was the floor of the elevator above the entrance of the door way? *A.* About three feet by the time I stopped, the elevator was not over three feet and a half.

*Q.* You stopped it as quick as you could. *A.* Yes, sir.

*Q.* If you had been looking at the boy when he fell, you could have stopped the elevator in time to have saved him? *A.* I think I could, yes, sir.

*Q.* What were you doing at the time? *A.* I was standing up, looking for the knot in the rope that came down to prevent the elevator hitting the top. The last time I saw Willie he was standing in the corner of the elevator.

*Q.* Before you heard the boy cry out, where had you last seen him standing? *A.* Right in the corner by the side of the door, the left-hand side of the elevator door.

\*     \*     \*     \*     \*     \*     \*     \*     \*

*Q.* Do you remember anything occurring on that trip, on the trip that the boy got hurt, anything about his trying to take the elevator rope, anything of that sort? *A.* I only know when I was going up, after I passed the second floor, he put his hand on it, and said he didn't think I could stop it with one hand—I don't think he got any hold; then he took his hand off the rope.

*Q.* Did he do anything? *A.* No; he walked into the corner, and, when I turned my back on him, I don't know how he got to the door."

On cross-examination this witness stated to-wit:

"*Q.* This was a slow elevator? *A.* Yes, sir.

*Q.* You say that elevator was unsteady? *A.* Yes, sir.

*Q.* I want to know the extent of its unsteadiness. It ran up between four walls? *A.* Yes, sir.

*Q.* The walls were close around it? *A.* Yes, sir, but the clutches on each side never fitted very tight.

*Q.* The clutches on each side? *A.* Yes, sir.

*Q.* Never fitted tight? *A.* Yes, sir, and that caused it to shake.

*Q.* All the time it was shaking, it was going slowly? *A.* Yes, sir; it was not a fast elevator.

*Q.* It could not have shaken enough to throw a man down the hole? *A.* No. There was a piece of iron worn as smooth as glass; the least jar there would make him slip.

*Q.* If he had been standing on it. *A.* Yes, sir.

*Q.* You don't think it shook enough to shake anybody off? *A.* Not unless they had a poor balance.

*Q.* What was the necessity of standing on the iron? *A.* None, unless they were in a hurry to get off as soon as it stopped.

*Q.* If he was going to get off and opened the door himself, he might take the position. There was no necessity of his doing it then? *A.* No, sir.

*Q.* Do you remember of the little boy on the third floor thinking he was on the fourth floor? *A.* No, I don't know he thought that.

*Q.* Do you remember, when he was on the third floor, of his catching hold of the rope and trying to stop it with one hand, and then his saying he could not do it on the fourth floor when he was only on the third? *A.* That was between the second and third he put his hand there. He said he didn't think he could stop it on the fourth floor with one hand.

*Q.* Where was he then? *A.* Between the second and third.

*Q.* You remember giving your testimony before the coroner, don't you? *A.* Yes, sir.

*Q.* I will ask you if you remember these various questions:

'*Q.* Now, tell all you know about the case? *A.* I stopped the elevator on the third floor, and, when I was ready to start, he said let's see if he could pull it with one hand.

*Q.* Who said? *A.* Little Robert Lee; and he could not pull it. I pulled the rope and I started the elevator up, and, when we got to the fourth floor, he aimed to step off on the little platform that is there, and then tried to step back again while the elevator was in motion, but it was too high for him, and he only got one foot on the elevator, and that foot was fastened in the side of the guard, had it fastened in the guard somewhere, and I did not see him, and the elevator going up; that pulled his foot up higher and he hollered, and I stopped the elevator as quick as I could as soon as he hollered. And then this fellow tried to catch——.

*Q.* What followed? *A.* Andrew Aylward tried to catch hold of his foot, and his foot slipped off of the elevator, and he rolled off of the door down through the shaft.' Do you remember those questions and answers? *A.* I said I suppose he tried to step off; I never saw him.

*Q.* That was a supposition of yours? *A.* Yes, sir.

*Q.* You didn't actually see him? *A.* No, sir.

*Q.* But you did stop it as soon as you saw him? *A.* Yes, sir; before I saw his foot—as soon as I heard him hollow.

\* \* \* \* \* \* \*

*Q.* What made him try to get out? *A.* I do not know; I suppose he mistook the fourth floor for the fifth.

*Q.* Do you remember that? *A.* Yes, sir.

*Q.* What makes you think that? *A.* Well, they have a habit of getting out because the elevator always stops itself on the fifth floor. *A.* Yes, sir."

From the foregoing evidence the jury could have drawn two inferences: *First.* They might have given credence to the statements made before the coroner, and affirmed on the trial by witness Aylward, that the deceased boy, Lee, "wanted to get off on the fifth floor, and, when he reached the fourth floor, he thought he was on the fifth *and tried to get off;*" and, to the further statement of this witness (admitted to have been made before the coroner), that "the elevator was going, and I suppose it turned it *(sic)* on his face. The elevator was going up to the fifth floor, and, while the elevator was going, *he walked right out of the elevator* onto the fourth, and his foot caught on one of the corners and he fell on his face; and the elevator kept agoing, and he gave a little hollo, and I made a grab for his foot and I tried to save him, but he was gone before I could." Had the jury relied upon this evidence, they might have reasonably inferred therefrom (as the testimony given on the trial shows the witnesses themselves did) that the deceased mistook the fourth floor for the fifth, and voluntarily got off there while the elevator was moving, and caught his foot in the guard in trying to get back on the elevator after he had discovered that it was not going to stop, and was thereby injured.

*Second.* The jury might have discredited the evidence given by this witness before the coroner on the day following the occurrence and affirmed on the trial, and given their entire belief to the other statements afterwards made on the trial by the two witnesses, Aylward and Willis, to the effect that they did not actually see the deceased until they heard him hollo, and then beheld him with one foot on the elevator and

the remainder of his body on the landing outside of the cage. To have adopted this view, the jury would have been compelled to confine their consideration to a *part* only of the testimony, and must have drawn from this portion an inference that the deceased lost his footing by the shaking or unsteadiness of the elevator cage, and thus fell or was thrown on the outside landing. Although the two witnesses for the respondents stated also on the trial that they did not see how the boy got on the outside landing, one of them (Aylwark) said, "he stepped off, I suppose," and the other witness (Willis) said, "I suppose he tried to step off; I never saw him," thus showing that neither of these witnesses supposed he fell, or was thrown, off the elevator by its shakiness, but, on the contrary, distinctly negatived this view in their own conclusions from what they saw.

In actions at law the jury are the sole judges of the weight of testimony and the credibility of witnesses. In such cases where the evidence is conflicting, or is susceptible of being the basis of different *rational* inferences, then it is the sole province of the jury to reconcile it, or to adopt that particular *rational* inference which, in their judgment, justly arises. These principles constrain us to hold, under the testimony in this case, that the trial court did not err in leaving it to the jury to say whether the deceased negligently stepped off the elevator or was thrown therefrom by the unsteadiness of the car.

The complaint as to the instruction *supra* is that the court therein told the jury "that there is a *legal presumption* that the deceased, Robert E. Lee, was in the exercise of ordinary care at the time" of the accident. The objection to this statement in the instruction is that it misled the jury under the evidence and legitimate inferences. The law is that in case of an

*unexplained* injury caused to one by negligently constructed machinery, or a negligent opening in the sidewalk, or other negligent contrivance, a rebuttable presumption that the party injured thereby was at the time exercising ordinary care may be indulged. If, however, there is substantial evidence of the manner and causes of the injury, such presumption ceases to exist. This is in accordance with the facts of the case, and the actual decision of the supreme court in *Buesching v. St. Louis Gas Light Co.*, 73 Mo. 233, and it is clearly the doctrine as now maintained by the supreme court in their subsequent decisions, and is supported by reason and the weight of authority in other states. *Moberly v. Railroad*, 98 Mo. 183; *Rapp v. Railroad Co.*, 106 Mo, 423; *Whitaker v. Morrison*, 44 Am. Dec. 627; Lawson on Presumptive Evidence, rule 120, p. 576; *Whitsett v. Railroad*, 25 N. W. Rep. 104; *Railroad v. Stebbing*, 52 Md. 504. In *Buesching v. St. Louis Gas Light Co.*, *supra*, it is said: "Slight circumstances, however, in the absence of direct evidence, may overcome the presumption of freedom from negligence which the law indulges." In that case there was no *evidence whatever* showing how the accident occurred.

In the case of *Moberly v. Railroad Co.*, 98 Mo. 183, the evidence was conflicting on the issue of plaintiff's negligence. In that case the court, in speaking of an instruction similar to the one under consideration, used the following language:

"Instruction numbered 5, given at plaintiff's instance, should not have told the jury that the law presumed that plaintiff exercised ordinary care, while submitting the question of his care or negligence as an issue. The presumption that everyone exercises ordinary care obtains in the absence of evidence to the contrary. But there was abundant evidence from which plaintiff's negligence on the occasion in question might

have been fairly found. With that evidence before
them, it was calculated to give the jury a wrong
impression of its effect to say that a presumption of
care then existed in plaintiff's favor."

This ruling was affirmed in *Rapp v. Railroad*, 106
Mo. 423. In that case, also, there was evidence from
which plaintiff's negligence might have reasonably been
found by the jury. It was therefore held that an
instruction, embodying a presumption that he was in
the exercise of ordinary care, should not have been
given.

The doctrine of these cases is that a disputable pre-
sumption, permitted to be drawn in the absence of all
evidence of the facts and circumstances, should not log-
ically be given in a charge to the jury after evidence
has supervened. The reason of the rule is that, *after
evidence*, the jury should determine the case on the
evidence, unbiased by a presumption which might have
been drawn *before* evidence.

In the case at bar there *was evidence* from which
the jury might have rationally inferred that the deceased
boy was neither shaken nor fell off the cage of the ele-
vator, but that he voluntarily tried to get off and get
back while it was in motion, and before it had reached
the proper landing. The existence of such evidence is
the ground upon which the supreme court in the two
cases last cited held an instruction like the one before
us reversible error. We hold, therefore, that the trial
court erred in giving, under the evidence in this case,
the instruction whereby the jury were told that there
was a legal presumption that the deceased was exercis-
ing ordinary care at the time of the accident.

The two cases, *Porter v. Railroad*, 71 Mo. 72, and
*Muirhead v. Railroad*, 19 Mo. App. 646, cited by
respondent in support of the instruction, are not in
point. The instructions in those cases merely stated

the rule of law applicable to contracts of service, whereby the servant is bound to assume the risks naturally incident to the work which he undertakes.    The propriety of that instruction furnishes no analogy for the giving of one asserting a presumption (disputable) of due care in favor of one whose negligence is an issue touching which there is a conflict of evidence.

As this case must be retried, the court should avoid, on the next trial, an inaccuracy in one of the instruction given for appellant, where the jury were told "that no inference of negligence can be made against the defendant in regard to said elevator, if you find from the evidence that it is such as is ordinarily used in like purposes by reasonably prudent persons engaged in the same kind of business." Mere usage by others is not the sole criterion. It is the duty of owners of elevators to make them reasonably safe for the uses to which they are to be put; and, in so doing, they should exercise that degree of care employed by reasonably prudent men in attaining the same end. *Reichla v. Gruensfelder*, 52 Mo. App. 43.

For the reason here given, the judgment is reversed and the cause remanded.    All the judges concur.