LEE v. PUBLISHERS KNAPP & CO., Appellant.

Division One, March 30, 1900.

1. **Practice:** DEMURRER TO EVIDENCE. The evidence in this case is reviewed, and it is *held*, that a demurrer thereto was properly overruled.

2. **Witnesses:** EXPERT: COMMON KNOWLEDGE. An expert witness, as such, should not be permitted to express his opinion concerning matters of common knowledge or of which the jurors are just as capable as he of forming an opinion.

3. **Carriers:** ELEVATORS: DEGREE OF CARE. Carriers of passengers by elevator are required to exercise the highest degree of care and skill for the personal safety of passengers, both in respect to the choice and manufacture of machinery and appliances, and in the selection of operatives; and when injury results to a passenger from the slightest negligence of an operative, such carrier will be held liable therefor, notwithstanding the highest degree of care may have been used in selecting such operative.

Appeal from St. Louis City Circuit Court.—*Hon. John A. Talty*, Judge.

AFFIRMED.

*A. & J. F. Lee* for appellant.

(1) The court below erred in giving plaintiff's instruction, numbered 3, of its own motion. The effect of this instruction was to allow plaintiff to recover, even though the accident happened in a way different from that set out in plaintiff's petition. Plaintiff alleged that deceased was caused to be thrown or fall from the elevator, and this instruction allows plaintiff to recover if deceased stepped or jumped from the elevator. Where a petition charges a specific act of negligence, an instruction is improper which authorizes a recovery if the defendant is guilty of some other act of negligence. Chitty v. Railroad, 49 S. W. Rep. 868 (Mo); Yarnell v. Railroad, 113 Mo. 570; Waldheir v. Railroad Co., 71 Mo. 514; Price v. Railroad, 72 Mo. 414; Stanard Milling Co. v. White Line C. T. Co., 122 Mo. 258. (2) The court erred in giving instruction numbered 1, at the request of plaintiff. This instruction in substance tells the jury that the operator of an elevator is a common carrier, and that he owes the highest degree of care to persons using same, and is liable for slight negligence in the operation thereof. This is not the law. The duty of the operator of an elevator is to use ordinary care in its operation, and he is liable to one injured

in an elevator only for failure to use ordinary care. O'Donnell v. Patton, 117 Mo. 13; Lee v. Knapp, 55 Mo. App. 390. (3) The court erred in refusing to give, at the request of defendant, at the close of the entire evidence an instruction in the nature of a demurrer to the evidence. Stoneman v. Railroad, 58 Mo. 503; Holman v. Railroad, 62 Mo. 562; Stepp. v. Railroad, 85 Mo. 229; Brown v. Hershey Land & Lumber Co., 65 Mo. App. 162; Breen v. St. Louis Cooperage Co., 50 Mo. App. 202; Smillie v. St. Bernard Dollar Store, 47 Mo. App. 402; Epperson v. Postal Telegraph Cable Co., 50 S. W. Rep. 807; State v. Brooks, 99 Mo. 137; Spillane v. Railroad, 135 Mo. 414; Payne v. Railroad, 129 Mo. 405; Graney v. Railroad, 140 Mo. 89; Payne v. Railroad, 136 Mo. 562; Butz v. Cavanaugh, 137 Mo. 503. (4) The court committed error in sustaining plaintiff's objections to the question asked of witness Brislin as to the safety of the construction of the doorways of the elevator, said Brislin having qualified as an expert. It is competent for one qualified as an expert in regard to machinery of any kind to testify as to the safety of a given machine. Cobb v. Railroad, 50 S. W. Rep., p. 894; Railroad v. Brooking, 51 S. W. Rep. 537; Goins v. Railroad, 47 Mo. App. 174; Illinois Central v. Davidson, 22 C. C. A. 306; Benjamin v. Railroad, 50 Mo. App. 602; Railroad v. Pitts, 42 S. W. Rep. 255; Lau v. Fletcher, 62 N. W. Rep. 357. (5) The court below erred in sustaining plaintiff's objection to certain questions asked by defendant in the direct examination of witness Brislin in regard to whether the construction of the elevator in question was proper. It is competent for one qualified as an expert in regard to elevators to state whether or not the given elevator is constructed in a proper manner. Railroad v. O'Brien, 16 Colo. 219; Hayes v. Railroad, 17 Utah, 99; Railroad v. Hackett, 39 Atl. Rep. 510; Grant v. Barney, 21 Colo. 329; Lang v. Terry, 163 Mass. 138; Neubauer v. Railroad, 60 Minn. 130; McGonigle v. Kane, 20 Colo. 292; Fitts

v. Railroad, 49 Wis. 323.    (6) The court below committed error in sustaining plaintiff's objection to a question asked by defendant in the direct examination of witness Brislin in regard to what was the ordinary construction of elevator approaches.    It is certainly competent for an expert on elevators to state what is the ordinary construction of elevators and approaches thereto.    Lee v. Publishers George Knapp & Co., 55 Mo. App. 406; Lang v. Terry, 163 Mass. 138; Fitts v. Railroad, 49 Wis. 323.    (7) The court below erred in sustaining plaintiff's objection to question asked by defendant in direct examination of witness Brislin in regard to the extent of the vibratory motion of the elevator.    When the subject of inquiry is so indefinite in its nature as not to be susceptible of direct proof, the opinions of witnesses are admissible.    In this case it is competent to ask the witness whether the vibratory motion was sufficient to cause a person to lose his balance.    Eyerman v. John Sheehan, 52 Mo. 221; State v. Buhler, 103 Mo. 203; McPherson v. Railroad, 97 Mo. 253; Boot & Shoe Co. v. Brown, 46 Mo. App. 581. (8) If plaintiff's action is brought under R. S. 1889, sec. 4226, the court below erred in refusing to set aside the verdict on the ground that it was excessive.    Under this section plaintiff's recovery was limited to the loss sustained by her, and the evidence fails to show that her loss amounted to anything like $3,500.    If, however, the plaintiff's action is brought under R. S. 1889, sec. 4425, then the verdict should have been either for $5,000 or nothing, and, therefore, a verdict for $3,500 is clearly erroneous.

A. R. Taylor and Virgil Rule for respondent.

(1)    (a) There was no evidence that deceased jumped into the vestibule and upon the platform, and having landed there in safety, fell into the shaft after the car had passed; and therefore no basis for the giving of the instructions com-

plained of in points 1, 2 and 3 by appellant. Curran v. Downs, 7 Mo. App. 329; Benjamin v. Railroad, 50 Mo. App. 602; State v. Wilforth, 74 Mo. 528; Chouteau v. Searcy, 8 Mo. 733; Stokes v. Ravenswood, 64 Mo. App. 420; Lester v. Railroad, 60 Mo. 265; Turner v. Railroad, 51 Mo. 501; Gosham v. Railroad, 113 Mo. 408. (b) The instruction as asked and modified, submitted to the jury an issue of fact raised by the affirmative defense pleaded in the answer, therefore defendant is not in a position to complain, and being based on the answer can not be considered as a departure from the petition. (c) If there had been evidence that the boy stepped from the elevator and fell through the defective shaft, such evidence, even if offered by plaintiff, would have only constituted a variance, and not a failure of proof as to the substantial negligence alleged, and such objection is waived. R. S. 1889, secs. 2096, 2097; Waldheir v. Railroad, 71 Mo. 514-518; Leslie v. Railroad, 88 Mo. 54; Alcorn v. Railroad, 108 Mo. 92. (2) Carriers of passengers by elevators are bound to exercise the highest degree of human care for the personal safety of the passengers, in every respect, whether in the construction of the elevator and machinery, or its operation by the attendant. Mitchell v. Marker, 62 Fed. Rep. 140; Hartford Deposit Co. v. Sallitt, 172 Ill. 222; Oberndorfer v. Pabst, 100 Wis. 513; Treadwell v. Whittier, 80 Cal. 574; McGrell v. Buffalo Building Co., 70 N. Y. St. Rep. 372; Morrison v. Metropolitan Tel. Co., 52 N. Y. St. Rep. 601; Tousey v. Roberts, 114 N. Y. 312; Gierchard v New, 65 N. Y. St. Rep. 20; Kentucky Hotel Co. v. Camp, 97 Ky. 474; Godsell v. Taylor, 41 Minn. 207; McGonigle v. Kane, 20 Colo. 292; Peoples' Bank v. Morgolofski, 75 Md. 432; Dawson v. Sloan, 100 N. Y. 620; Laws Mass. 1890, ch. 90; Gen. Laws Minn. 1895, ch. 171; 1893, ch. 7, sec. 3; Laws N. Y. 1892, ch. 673, sec. 3; 1890, ch. 398, sec. 8; Laws Penn. 1895, p. 129; Laws Mich. 1893, 126, sec. 8; Laws Conn. 1893, ch. 118. (3) (a) If reasonable men

might fairly differ on the question of defendant's negligence, it is for the jury to determine, and the court did not err in submitting the question to the jury. Lee v. Knapp & Co., 55 Mo. App. 390; Lee v. Knapp & Co., 137 Mo. 385. (b) Contributory negligence, as a matter of law, can not be imputed to a child twelve years old. Murphy v. Railroad, 43 Mo. App. 342; Gass v. Railroad, 57 Mo. App. 574. (4) The evidence of expert witnesses is not admissible unless it is clear that the jurors themselves, from want of experience or knowledge of the subject, are not capable of drawing correct conclusions from the facts proved. In this case the jurors were just as capable of drawing correct conclusions from the facts proved, as the witness himself. Benjamin v. Railroad, 133 Mo. 274; Griffin v. Willow, 43 Wis. 509; Koons v. Railroad, 65 Mo. 597; Eubank v. Edina, 88 Mo. 655; Gutridge v. Railroad, 94 Mo. 472; King v. Railroad, 98 Mo. 240; Naughton v. Stagg, 4 Mo. App. 271; Reid v. Ins. Co., 58 Mo. 521; Bills v. Ottumwa, 35 Iowa, 109; Hambleton v. Railroad, 36 Iowa, 31; Hughes v. Muscatine Co., 44 Iowa, 672; McDonald v. State, 27 N. E. Rep. 358; Ivory v. Deerpark, 22 N. E. Rep. 1080; Bailey v. Railroad, 8 N. Y. Supp. 780; Bohr v. Neunschorander, 22 N. E. Rep. 416; DeBerry v. Railroad, 6 S. E. Rep. 723; Yeaw v. Williams, 15 R. I. 20; Kold v. Sandwich Enterprise Co., 36 Ill. App. 419; Lincoln v. Barry, 5 Cush. 590; Ryerson v. Abdington, 102 Mass. 526; Kelly v. Fond du Lac, 31 Wis. 179; Montgomery v. Scott, 34 Wis. 338. (5) (a) The questions which these witnesses were not permitted to answer were objectionable because they submitted a matter in issue to the judgment of the witness. Madden v. Railroad, 50 Mo. App. 666. (b) And because the subject was not beyond the knowledge or experience of ordinary men, and the jury were capable of drawing correct conclusions from the facts testified to by the witnesses. Gavisk v. Railroad, 49 Mo. 274; Walton v. Railroad, 40 Mo. App. 544;

Railroad v. St. L. Stock Yards, 120 Mo. 541; Hurt v. Railroad, 94 Mo. 255; Gregory v. Chambers, 78 Mo. 294.

BRACE, P. J.—On the 12th of September, 1892, General Robert E. Lee, a boy about 12 years of age, generally known by the name of Willie, was killed by a fall from the cage or car of an elevator belonging to and being operated by defendant in its five story building on the corner of Third and Chestnut streets in the city of St. Louis.

This action was originally brought by the father and mother of said child to recover damages for his death, and upon a trial thereof resulted in a verdict and judgment for the plaintiffs in the circuit court for the sum of $1,600. On appeal by defendant from that judgment, to the St. Louis Court of Appeals, the same was reversed for error in giving an instruction. 55 Mo. App. 390. Upon a second trial in the circuit court, the jury returned a verdict for the plaintiffs for one cent damages, and on motion, that verdict was set aside and a new trial granted by that court. From that order the defendants appealed to this court, where the order granting a new trial was sustained, 137 Mo. 385. The father having died in the meantime, the suit was thereafter prosecuted by the respondent, Elizabeth Lee, his mother, as sole party plaintiff, and upon the third trial she obtained a verdict and judgment for $3,500. From which judgment the defendant appeals, assigning as error:

1. The refusal of the court to sustain defendant's demurrer to the evidence.

2. The sustaining by the court of plaintiff's objections to certain questions propounded for the defendant.

3. The giving of instructions numbered 1 for the plaintiff, and an instruction on its own motion, and the refusal to give instructions 2, A, 8 and 10 for the defendant.

4. The refusal of the court to set aside the verdict for excess of damages.

In consequence of the death of her husband, the plaintiff, on the 13th of May, 1897, filed an amended petition, setting up therein the original cause of action, the gravamen of the charge being that whilst her said son was a passenger upon defendant's said passenger elevator he fell from said elevator and sustained such injuries that he was thereby immediately killed; "and plaintiff avers that said elevator at said time was in a defective and dangerous condition; that the construction of said elevator was such that the car or cage of said elevator in which plaintiff's said son was being so carried, as a passenger, in passing the doorways of the several floors of said building and elevator shaft, was defective; that there was an open space between the floor of said elevator car and the door of the elevator of the dimensions of two and one-half feet in depth, three feet in width, and eight feet in height, making a dangerous hole or trap, into which the passengers upon said elevator were likely to fall; that said elevator and shaft were also in a further defective condition, in that in the running of said elevator it would shake and was unsteady. And plaintiff further charges that defendant at the time of the death of her son was further negligent in having in charge of said elevator an inexperienced servant controlling same, who did not understand the operation of said elevator; that on the date aforesaid, whilst plaintiff's said son was such passenger upon said elevator, by reason of the negligent construction of said elevator and shaft, and doorways, and by reason of said defective condition of said elevator in so running unsteady and by reason of the negligence and unskillfulness of defendant's servant in charge of said elevator, the plaintiff's son was while such passenger caused to be thrown or fall from said elevator car and to be thereby killed."

The answer was a general denial and a plea of contributory negligence. The evidence in the case upon which the

legal questions to be determined, arise on this appeal, is in substance as follows:

Elizabeth Lee, plaintiff, testified to the death of her son on the 12th of September, 1892, that his age at that date was 12 years, and that he was earning $20 per month as a messenger boy for the Western Union Telegraph Company, and that her husband died on the 6th of May, 1896.

Andrew Aylward testified that he was a telephone operator for the St. Louis Metropolitan Police Department at the fifth district police station, Tenth and Market, and that he had been at work there three years; that in September, 1892, he was engaged as reporter boy for the Western Union Telegraph Company; that at the time he was about thirteen years old and weighed about eighty-six pounds; that he knew the Lee boy; that the latter generally worked downstairs, and used to go on duty at six o'clock and worked until two o'clock; that the Lee boy used to work until ten carrying messages, and at ten used to go upstairs and carry messages with witness to the newspaper offices for the Associated Press, among others to the St. Louis Republic; that he was in the elevator the night the Lee boy was killed; about twelve or one, between the hours of twelve and one; that just three were in the elevator, the witness, the Lee boy, and the elevator boy; that the elevator boy was about the same size as the other two, possibly a little larger, and was a mulatto. The Lee boy was going to the fifth floor to take the reports he had up to the office, to a Republic man whose name was Lawson or Dawson. The elevator was on the Chestnut street side, and no other elevator was running in the building at that time of night. It was a passenger elevator, and the Lee boy fell off on the fourth floor.

"Q. Right at the landing, or where? What was the

first thing you saw of the Lee boy? A. Me and this Willis, we were talking.

"Q. Willis was the name of the elevator boy? A. Yes; we were talking and we heard the hollow, and I turned around and saw the Lee boy on his face and hands on the space of the floor. I made a grab for his feet, and as I did the elevator went up more and he swung and went down.

"Q. Was this the position he was in when you first saw him? [Hading paper to witness. See next page].

"Q. I will ask you now if that diagram indicates the position in which you saw the boy at the time?

"A. Yes, sir.

"Q. What was your position when you heard the boy hollow? A. I don't know whether my back was turned toward him or my side toward him. I was standing in front of the Willis boy.

"Q. Where was the Lee boy the last time you saw him before you saw him in the open space? A. He was standing in the corner opposite where we were standing.

"Q. In reference to the points of compass, which corner of the elevator was he in? A. The southeast corner as you go into the building; you go in the elevator where the rope is; it is on this side [indicating], and on that side he was standing.

"Q. The rope is on the west side and he was standing on the east side of the opening on the south side of the elevator? A. Yes, sir.

"Q. How close to the elevator door was he, to the opening? A. I think only that big a space [indicating]; there is a little space comes around here [indicating].

"Q. How close was he to the open space, the door of the cab? A. He was standing right in front of it, like in the corner.

"Q. Where was the elevator at that time, at the time

you saw him standing in front of the open space, about what
floor, if you know and can remember? A. If I am not
mistaken, he went to that corner as soon as he went in the
elevator and stood there.

"Q. The last time you noticed him before you heard
the hollow? A. I could not tell you whether the elevator
was moving at the time or whether it was on the first floor
when he stepped into the elevator.

"Q. You remember seeing the boy in the elevator
after you started from the first floor, do you not? A. Yes,
sir.

"Q. The last time you remember of seeing the boy in
the elevator, before you saw him in the open space, where
was the elevator, if you know? A. We stopped the eleva-
tor on the way up, and he asked me something about pulling
the rope with one hand, and we could not do it, so we started
the elevator afterwards and he went back to the corner.

"Q. Do you remember which floor it was? A. It
was the second or third floor; I could not tell you exactly.

"Q. Is there any protection or guard on the elevator at
all? A. No, sir.

"Q. Where is the door that opens and shuts to let peo-
ple into the building? A. We will say this is the wall
[indicating]; the elevator comes here [indicating]; as you
open the door the door sets back that far [indicating] from
the wall.

"Q. About how wide is that door? A. The door may
be about that wide [indicating].

"Q. And is that the condition of affairs on every floor
after you leave the first? A. Yes, sir.

"Q. Was that the condition on the night of the 12th
of September? A. Yes, sir.

"Q. Now just describe to the jury, in your own way,
the situation of the boy in the hole when you first saw him

after he hollowed, and what you did and what the elevator boy did, and then what become of the boy? A. The only thing was when we started up the floor after we stopped the elevator, he tried to pull it with one hand; after the thing started again I started to talk to the elevator boy, Willis, and we kept on talking until we heard the hollowing, and I turned around and I saw the little Lee boy on his face and hands and his foot stuck in the corner where he was standing, caught there, and as I reached for it the elevator went up a little higher and he fell through the space and went to the bottom.

"Q. As you reached for his foot? A. Yes, sir.

"Q. You saw the report in his hand, did you not? A. Yes, sir.

"Q. Then what did you boys do? A. We came down after that, and I guess we kept it seven or eight feet above him, and I got down on my knees on the floor of the elevator and reached over and pulled the latch in the bottom door on the bottom floor where he fell, and there were some men standing by the door; they went in and took him and laid him on the floor and we came down and got out.

"Q. What was his condition at that time? A. When I saw him he was gaping like.

"Q. Was he able to talk? A. He didn't say anything while I was there.

"Q. Describe to the jury as best you can the motion of the elevator in running? A. She used to shake and jump like when she would be going up.

"Q. Was it running this way on this night? A. Yes, sir.

"Cross-examination by Mr. Lee.

"Q. You testified before the coroner the very morning of the accident? A. Yes, sir.

"Q. It occurred at midnight, or a little after midnight, on the 12th of September, 1892, and in the morning you were at the coroner's office and gave your testimony as to how it occurred? A. Yes, sir.

"Q. Did you say anything there about the elevator shaking in any way? A. I wasn't asked anything about it.

"Q. He asked you to tell how the accident occurred, didn't he? A. Yes, sir.

"Q. You did not say anything about it shaking at all, did you? A. No, sir.

"Q. Did you tell him the boy stepped off the elevator onto the platform? A. That he stepped off?

"Q. Didn't you tell the coroner that the Lee boy, when he got to the fourth floor, stepped off the elevator onto the platform? A. I don't remember."

Mr. Lee, the counsel for the defendant, here handed the witness a paper containing his evidence before the coroner, the signature to which he admitted to be his, and which was afterwards offered in evidence on behalf of the defendant. To avoid repetition and for the sake of brevity, the long cross-examination to which he was subjected in regard to questions and answers contained in that document, all of which were repeated to him, but very few of which he remembered, are here omitted, but will hereafter be noticed as far as necessary, in connection with that evidence in the course of the opinion.

After which the following witnesses testified in chief as follows:

T. A. Moore testified that he was a life insurance agent and that in September, 1892, he was employed as clerk by the Wiggins Ferry Company, which at that time occupied offices on the third floor of the Republic building, Third and Chestnut streets; that prior to September 12th of said year he had occasion to use the Chestnut street elevator in said

building; that there was an offset on each floor between the elevator and door opening into the hall, the elevator itself having no door and there being a space about that wide [indicating] which one had to traverse to get to the door opening out into the hall. The same condition of affairs prevailed on each floor; that this diagram [see next page] fairly represents the doorway:

Witness had occasion to work there at night as well as day. After half-past six in the evening there was no other elevator running in the building except the Chestnut street elevator; that he rode in that elevator three or four times a week; that the motion was of a jerky sort, sort of jumping like the old fashioned engine would accomplish.

C. F. W. Tate testified that he was clerking for Wiggins Ferry Company in the Security building; that in 1892 he was working in the Republic building, and had occasion to use the Chestnut street elevator just a few times; that he couldn't describe the motion of the elevator very well, but that it would strike you as a shaky elevator, a rattle-trap.

R. M. Yost testified he was a newspaper man, and was with the St. Louis Republic prior to September 12, 1892, and had an office on Third and Chestnut streets; that he had occasion during that time to use the Chestnut street elevator; that, as nearly as he could recollect, the motion of the elevator was jerks to one side and then a slight motion upwards, like that [indicating].

E. C. Albright testified that he was a printer by profession, and that in the month of September, 1892, he was in the Republic office, and had occasion to ride in the Chestnut street elevator about twice a day and sometimes more, generally at night. In the month of September, and prior to the 12th day thereof, the elevator didn't run very nicely; it was shaky all round [indicating]; that is about [indicating].

Charles T. Smiley testified that he was a collector for

A. ELEVATOR FLOOR.
B. HALL OR RECESS SPOKEN OF AS PLATFORM.

the Wiggins Ferry Company and worked in the Republic building on the corner of Third and Chestnut, prior to September 12, 1892; that he quite frequently had occasion to ride up in the Chestnut street elevator. The elevator had a very slow, jerky motion.

### DEFENDANT'S TESTIMONY.

David A. Brislin, an expert in the construction of elevators, and who knew the construction of this elevator and its movement, testified that it was an Otis steam elevator converted into a hydraulic elevator, and described its construction and movement.

In course of his examination in chief he was asked the following questions to which counsel for plaintiff objected, the objections were sustained, and defendant excepted.

"Q. How does the arrangement of the approach there, a space of seventeen or eighteen inches one way and three feet the other, by having the door on the outside, compare in safety with the method of having the door against the cab itself?

"Q. I will ask you if this construction you have here described, and which you are acquainted with, in regard to the vestibule platform and approach to the door on the outside of the hall is a proper construction?

"Q. Now, I will ask you if the construction of this elevator, having regard in the question to the elevator approach on the vestibule platform seventeen or eighteen inches in one direction and three feet in another, through that doorway, cut in the fire wall, and with the door on the hall side or outside, as regards the elevator cab, is proper construction?

"Q. Will you state what is the reason, if you know, for placing the door, in the case of an elevator built with a shaft like this on the outside, or hall side of the elevator shaft?

"Q.  Tell me whether or not that construction is an ordinary construction in regard to the elevator approach in that building?"

He further testified that he rode in the elevator within about two months prior to the accident and also rode in it within two months after the accident.  When he last saw the elevator before the accident, there was not any more motion in the elevator than the tremor in any first class elevator.  The vibration in this elevator was not great enough to move anything.  Certainly no inanimate object on the floor could be moved, nor could he see how any animate object could be moved.

"Q.  Could any person have his balance upset by that motion?"  To which question counsel for plaintiff also objected, the objection was sustained, and the defendant excepted.

Albert Lawson testified that he was a newspaper man connected with the Post Dispatch.  On September 12, 1892, he was night editor of the Republic.  He was in the Republic building on the night of this accident.  Presumed that he went up on the Chestnut street elevator that night.  Generally reached his office at five o'clock in the evening and generally took the Chestnut street elevator.  He visited his office every day.  He left there about half-past three in the morning.  Left there the morning of the accident about that time.  Presumed he used that elevator three thousand times, more or less, during the period he was night editor of the Republic, and could not recall anything in particular in connection with the action of the elevator; never impressed itself upon him except that it went slowly.  There might be a slight tremor, as is usual in many elevators, but beyond that he had no impression of anything out of order at all.  He presumed he rode on it the night of the accident.

Chas. W. Knapp testified that he was a journalist and

Lee v. Knapp & Co.

president of the corporation defendant in this case, Pub-
lishers George Knapp & Company, editor and general man-
ager of the Republic. Knew the elevator in question very
well. Condition of elevator was the same on September 12,
1892, that it had been since 1889 or 1890. It was the same
then as it had been all along, except a change in the con-
struction of the guards on the outside of the cab. Had not
used the elevator for a period of possibly thirty or forty
days previous to September 12, 1892, as he was out of the
city. The motion of the elevator was a tremor. That word
expressed it better than anything else; a slight movement,
perceptible movement, but not exactly what you would call a
shake in the proper sense. There was no jerk in the eleva-
tor when it was in motion, though there might be a jerk if the
elevator would stop suddenly. Tremor was exactly the same
sort of movement as occurs when a heavily loaded coal
wagon is moving across the street on the outside of a build-
ing and you near the building line and you feel a slight
movement. On the day following the accident the condition
of the elevator was just the same as it had been at all times
before and since.

"James R. Truehart testified that he was connected with
the St. Louis Republic and was connected with it on Septem-
ber 12, 1892. Remembered the occurrence of the accident,
though he was not in that part of the building. Was editor
of the Weekly Republic. Became connected with the Re-
public as editor of the Weekly and Semi-Weekly Republic
in the latter part of May, 1887. Had gone up and down in
the Chestnut street elevator nearly every day for five years.
When he could he used the Third street elevator, but he
used the Chestnut street elevator very often, as he usually
did not go there in the evening until after the Third street
elevator had stopped. This Chestnut street elevator ran
after six at night and the Third street was closed at night.

The Third street elevator was used for the offices and only went to the fourth floor. His duties were on the fifth floor. Has had his infirmity (referring to twisted, crippled, and deformed legs) since he was a child. In traveling on the Chestnut street elevator at the time of the accident and other times he did not remember anything like a jerk at all. The only complaint that was made of it was that it was so slow and took all eternity to get upstairs.

Defendant's counsel offer and read in evidence, for the purpose of contradicting the statements of Andrew Aylward, made on this trial, his testimony delivered before the coroner and signed by him, in words and figures as follows, to-wit:

"By the Coroner:  What is your name?  A.  Andrew Aylward.

"Q.  Where do you live?  A.  2121 Biddle street.

"Q.  What is your occupation?  A.  I am a reporter boy for the Western Union.

"Q.  Did you know General Robert E. Lee?  A.  Yes, sir.

"Q.  How long have you known him?  A.  Ever since he came to work at the Western Union.

"Q.  How long is that?  A.  I do not know how long it is; I do not know how long he is working there.

"Q.  About how long?  A.  He is working there about —let's see—he ain't working there a month I don't think.

"Q.  Were you with him when he—?  A.  Me and the little fellow and that boy over there was in the elevator, and he wanted to get out on the fourth floor when he ought to go to the fifth, and his foot got caught in one of the corners of the elevator, and he fell on his face.

"Q.  Tell all you know about it?  A.  And the elevator went up a little higher and he fell through the space about this much [indicating]; the elevator was about that

much higher than the floor [indicating about fifteen inches]. It was going when he went to jump off. You know they stop the elevator on the third floor, and he said: 'Let me see if I could pull that rope with one hand,' and he tried it and he could not do it, and the boy pulled the elevator.

"Q. What boy pulled the elevator? A. That there boy pulled the elevator.

"Q. What is his name? A. I do not know what is his name [indicating Charles Willis].

"Q. Is that the boy? A. Yes, si

"Q. What did Charles Willis do? A. You know he pulled the elevator from the third floor after stopping, and it kept on going, and this little boy wanted to get off.

"Q. What little boy? A. Willie Lee.

"Q. He wanted to get off, where? A. On the fifth floor; but he thought the fourth was the fifth.

"Q. How do you know he thought the fourth was the fifth? A. I suppose that was the way this boy said."

Plaintiff's counsel object to this answer. Objection sustained. Defendant at the time duly excepts.

"Q. What boy? A. This boy down there [indicating Willis] said it was the fourth floor down there when he was only on the third, and the little boy was gone.

"Q. What little boy was gone? A. Willie Lee; the elevator was gone and he wanted to get off.

"Q. Who wanted to get off? A. Willie Lee.

"Q. Where did he want to get off? A. He wanted to get off on the fifth floor, but he walked off on the fourth floor.

"Q. What did he walk off on the fourth floor for? A. I do not know; his foot got caught in one of the corners of the elevator, and he fell.

"Q. How did his foot get caught? A. I do not know how his foot got caught. The elevator was going, and

.I suppose it throwed him on his face while he was walking off.

"Q. On what floor did he get out of the elevator? A. The fourth floor.

"Q. Who opened the door? A. The door was not opened. You know there is a little platform about from there to there [indicating about fifteen inches] on the inside, and they all get off there; and he got off, and the elevator went up about this much space [indicating about fifteen inches] from that door, and he came right through that space and fell through, and right between the wall, down in the bottom.

"Q. Did he fall through that space? A. Yes.

"Q. How did he come to fall? A. I do not know how he came to fall.

"Q. Did you not say a minute ago he thought he was on the fifth floor and went to get out? A. Yes.

"Q. Did he fall through or did he go through himself? A. He fell through.

"Q. Is there not a door on the elevator on each landing? A. No, sir.

"Q. What is there at each landing? A. It is just an open space.

"Q. No door there? A. No, sir.

"Q. Any door on the fourth floor? A. Yes, sir; not in the elevator, though.

"Q. Where is it? A. It is on the floor, but not in the elevator. You know the elevator has got a space without any doors on it, and he could walk right out of the elevator onto this little platform. The door is on the outside, it is not on the inside.

"Q. How is it on the fourth floor, is the door on the inside or outside? A. On the outside.

"Q. What do you mean by the outside? A. It is on

the floor, on the same floor, but there is a part of the floor
comes from about there to there [indicating about fifteen
inches] out from the elevator door, and the elevator goes
right up, and it stops even with the floor, and you get on that
little platforrm and open the door and walk in.

"Q.   Who opened the door?   A.   Nobody; there was
two men coming in the door while this little fellow fell.

"Q.   Did anyone push him?   A.   No, sir.

"Q.   How did he come to fall?   A.   I do not know
how he came to fall.

"Q.   Were you in the elevator?   A.   Yes, sir.

"Q.   Were you looking at him?   A.   Yes, sir.

"Q.   Do you know how he came to fall?   A.   The ele-
vator was going and I suppose it turned him onto his face;
the elevator was going up to the fifth floor, and while the
elevator was going he walked right out of the elevator onto
the fourth, and his foot got caught on one of the corners and
he fell on his face, and the elevator kept agoing, and he gave
a little holler, and I made a grab for his feet and I tried to
save him, but he was gone before I could.

"Plaintiff's counsel object to these words, 'And I sup-
pose it turned him onto his face.'   Objection sustained.
Defendant at the time duly excepts.

"Q.   He got caught in getting out?   A.   Yes.

"Q.   What did he get caught in?   A.   In one of the
corners on the left side of the elevator, and just as he hoi-
lered that boy stopped the elevator as quick as he could.

"Q.   Did you say the door was closed or open?   A.
Closed.

"Q.   What did he try to get out for if the door was
closed?   A.   I do not know what he tried to get out for; he
had one foot like this [indicating] and one foot on the plat-
form, and he fell, and he went right down through the space,
and he had his little reports in his hand, he wanted to go on

the fifth floor; he got out on the fourth, and fell, and then he went through the space that the elevator had.

"Q.   How fast was the elevator going?   A.   It ain't a very fast elevator, you can't make it go; the one on Third street could go up and down five times while that would be going up once, it is not a very fast elevator at all.

"Q.   Does that elevator always go slow?   A.   Yes, sir; you can not make it go any faster.

"Q.   What did the elevator boy say about it being the third floor when he got there?   A.   You know we stopped it on the third, and this little fellow said to me:   "I'll bet you you can not pull that rope with one hand."

"Q.   Who said that?   A.   Little Willie; and I tried and I could not do it; and he said: 'wait until I show you how I can do it.'   He got down and tried to pull it, and he could not, and he said:   'I can not pull it on the fourth floor.'

"Q.   It was he and not the elevator boy who said that?   A.   Yes, sir; it was the little boy that said it.

"Q.   The little boy that got killed?   A.   Yes, sir; and then we went up on the fourth, they was only at the third when they said that; they went up to the fourth and the little fellow stepped off with his right foot on the little platform, and then he fell on his face and fell through the space of the elevator.

"Q.   Do the boys usually get out when the elevator is moving?   A.   Well, I get out on the fifth floor always.

"Q.   Do you get out when the elevator is moving?   A. Yes, sir; because you could not get hurted on the fifth floor; comes and it strikes a rubber and that stops the elevator; you can not go no more on the fifth floor.

"Q.   The elevator is not going then when you get out, is it?   A.   I get out—no, sir; not when I get out on the fifth floor, it is not going.

"Q.   Do the boys get out on any floor when the eleva-

tor is moving? A. Well, some boys they have some reports for the fourth floor, and they get out on the fourth floor.

"Q. When the edevator is moving or when it is stopped? A. When it is stopped.

"Q. Did he get out on the fourth floor because he thought it was the fifth? A. I suppose so."

After which defendant introduced several other witnesses, whose evidence corroborated that of Messrs. Brislin, Lawson, Knapp and Truehart.

Instruction number 1 given for the plaintiff is as follows:

"If the jurors believe and find from the evidence in this case that the plaintiff is the mother and sole surviving parent of Robert E. Lee, deceased; and that defendant, on the 12th day of September, 1892, was maintaining the elevator mentioned in the evidence, for the purpose of carrying passengers between the floors of its building, at the corner of Third and Chestnut street in the city of St. Louis; and that on said day the plaintiff's said son was a minor of the age of twelve years, and in the employment of the Western Union Telegraph Company; and that on said day the plaintiff's said son was received by defendant's employee in charge of its elevator, as a passenger upon said elevator, to be carried as such passenger to the fifth story of said building, on business with defendant—then you are instructed that it thereby became defendant's duty to use the highest degree of practicable care and diligence which prudent men would observe in a like business and under like circumstances, to carry plaintiff's son to the fifth story of said building, and there give him reasonable time and opportunity to alight in safety from said elevator car; and, if the jury further find from the evidence that as pliantiff's son was being carried on said elevator to the fifth floor of said building he fell to the bottom of the elevator shaft and was thereby killed; and that said elevator was so constructed that in passing each floor of said building

the floor of the elevator passed at such a distance from the door entrance to the elevator as to leave a space into which a person was liable to fall; and, if the jury further find from the evidence that such construction of said elevator and entrance thereto, rendered said elevator dangerous to passengers riding thereon; and, that the defendant in maintaining said elevator in said condition, for the carriage of passengers, was guilty of slight negligence; and, if the jury further find from the evidence that the plaintiff's son was caused to fall into said elevator shaft and to be thereby killed by reason of said defective condition of said elevator, and, if the jury further find from the evidence that the plaintiff's son was exercising ordinary care, according to his age and discretion, and such care as a boy of his age and discretion would ordinarily use under similar circumstances, at the time that he fell from said elevator, then the plaintiff is entitled to recover."

In lieu of instruction number 2, which was identical with number 1 asked for the defendant, the court gave the following instruction, which is identical with said number 2, refused, except the words italicized within brackets, which were interpolated by the court.

"The court instructs the jury that the defendant does not guarantee or insure the safety of passengers upon its elevator, and that you can not find for the plaintiff in this case unless you find that the defendant was guilty of negligence; and further, unless you find it guilty of one of the specific acts of negligence with which it is charged in this case, and that one of such specific acts of negligence directly caused the death of the son of plaintiff. The only acts of negligence with which the defendant is charged in this case are:

"1.   That the construction of the elevator at the time of the accident was defective, in leaving an open space between the floor of said elevator car and the door of the ele-

vator; that this made a dangerous hole or trap into which passengers upon said elevator were likely to fall.

"2.    That said elevator and shaft were in a defective condition insomuch that in the running of said elevator it shook and was unsteady.

"3.    That the defendant had an inexperienced servant controlling the elevator who did not understand its operation.

"As to the first charge of negligence, the fact of the dangerous space alleged, you can not find the defendant liable on this charge, unless you find from the evidence that this was a dangerous space, and that it was one into which passengers were likely to fall, and, before you can find the defendant liable on this charge, you must find from the evidence that the deceased, General Robert E. Lee, did actually fall into this hole.   If you find, from the evidence, that the deceased boy did not fall into said open space and into the elevator shaft below, but actually stepped or jumped into the vestibule platform and fell from there into the elevator shaft below [*and that in doing so he did not exercise ordinary care, as defined in the other instructions herein*] then his, mother can not recover on this charge of negligence; and the fact of itself that the space was dangerous and was likely to produce the injuries received, unless it did actually cause the death of said deceased while he was himself in the exercise of due care, regard being had to his age and experience, will not justify a recovery on that ground.

"As to the second charge, the fact, if you find it to be such, that the elevator shook and was unsteady, and was dangerous on that account, and that it was negligence in the defendant to have it in such condition, is immaterial in this case, and would not justify your finding a verdict for the plaintiff, unless you find from the evidence that the shaking of the elevator and its being unsteady caused the death of the boy; and that he was actually shaken from the elevator or that he fell or was thrown therefrom.   If you find from

the evidence that it was negligence on the part of the defendant to have an open space between the elevator and the door, still you can not find for the plaintiff, unless you find from the evidence that the leaving of this open space was the direct cause of the death of the deceased boy. If you find from the evidence that his own negligence as explained in these instructions directly contributed to bring about his death, or if you find that his death was due to the concurrent negligence of the deceased himself and of the defendant, in either event, your verdict must be for the defendant."

The other refused instructions of the defendant are as follows:

"A.   You are instructed that if you find from the evidence that the deceased boy Lee jumped or leaped or stepped from the elevator while in motion and was killed thereby, there can be no recovery in this action; and the issue whether he stepped from the elevator or fell or was shaken or thrown therefrom is to be determined by you by reasonable inference to be drawn by you from the facts and circumstances in evidence in this case; and before you can find that he fell or was shaken or thrown from the elevator you must find that it is established to your satisfaction by a preponderance of the evidence that he did fall or was in fact shaken or thrown from the elevator, and such finding on your part must be based upon a reasonable inference, and not be a mere guess or wild conjecture. If you find from the evidence, first, that it is not a reasonable inference that the deceased did fall or was shaken or thrown from the elevator, or, second, that it is a more reasonable inference that he stepped from the elevator, or, third, if you find from the evidence that the evidence does not permit you to make a reasonable inference in any way as to how the death was caused, in either of these events your verdict must be for the defendant.

"8.   The court instructs you that it is not the duty of

the defendant to furnish any particular kind of elevator, or to have it and the arrangements connected therewith absolutely safe, and that you can not find the defendant liable for negligence on the ground that it has not used the most modern appliances, and that you can only hold the defendant liable for the want of ordinary care which you find from the evidence, if you so find, directly caused the death of the deceased boy.

"11.   The court instructs the jury that plaintiff can not recover in this case, and their verdict must be for the defendant.

"10.   The court instructs you that if you believe from the evidence the vestibule or open space between the elevator cab and the door made an alluring place there which was tempting to a boy of the decedent's age to jump upon while the elevator was in motion, and you further believe from the evidence that it was negligence on the part of the defendant to leave this open space, because of its tempting or alluring character to boys of the age of deceased boy, such negligence is immaterial and is not to be considered by you, and you can not find for the plaintiff, unless you find that her son was shaken or fell from the elevator."

Which instructions the court refused to give; to which refusal of its instructions thus prayed for, the defendant, by its counsel, then and there duly excepted.

(1) It is contended for the defendants that the demurrer to the evidence ought to have been sustained, on two grounds, stated in brief of counsel as follows: *First*— "While some evidence was introduced tending to show that there was a jerky motion to the elevator and that the doorways were constructed with recesses, still there was absolutely no evidence introduced tending to show that the accident was caused either by this shaky motion, or this construction of the doorways leading thereto." *Second*—Because plaintiff's own testimony clearly shows that deceased

was not caused to be thrown or fall from the elevator as alleged in plaintiff's petition, but deliberately stepped from the elevator while it was in motion."

The case made for the plaintiff by the evidence on the trial from which this appeal was taken is substantially the same as that made on the former trials, and as upon the former appeals, it was held that the evidence was sufficient to take the case to the jury and good reasons given therefor, in the opinions delivered on those appeals (137 Mo. 385; 55 Mo. App. 390), it is sufficient to say in answer to this contention, that plaintiff's cause of action was based not only on the defective construction of the elevator and its shaky or jerky motion, but also upon the negligence and unskillfulness of the operator; and that from the facts established by the evidence, the inference might well be drawn, by reasonable minds, that the deceased was precipitated from the elevator, and came to his death by some of the causes set out in the petition, or by a combination of all of them. That from these facts an inference might also be drawn that he stepped from the cage while it was in motion, is also true; but that "plaintiff's own evidence clearly shows" that such was the fact, is not true. That fact was not shown by the evidence on the last or any former trial. The only basis for this claim apart from the facts from which the inference might be drawn, is a deduction by the witness Aylward in his evidence given before the coroner on the day after the accident, and introduced for the purpose of impeaching his evidence on the trial. In the long cross-examination to which this witness was subjected on the trial, notwithstanding the continued and persistent effort of counsel to get him to say that the deceased stepped from the cage into the doorway—or to admit that he had so testified before the coroner, he persistently testified, as he had on all former trials, that he did not see the deceased until after he had fallen into the doorway, and was in the position shown in the diagram. He was but thir-

teen years of age when he testified before the coroner, and the source from whence this deduction of the child, then made, was drawn, is manifested by the following extract from that examination:

"Q.   He wanted to get off where?   A.   On the fifth floor; but he thought the fourth was the fifth.

"Q.   How do you know he thought the fourth was the fifth?   A.   I suppose that was the way......This boy down there [indicating elevator boy] said it was the fourth floor down there when he was only on the third."

When this whole examination before the coroner is read in connection with the consistent evidence of the witness on the trial, it is perfectly manifest that when the child was describing the accident before the coroner, the *inception of* which *he did not see*, he was mingling with the facts which *he did see and know*, his own thought as to the facts which preceded those within his knowledge, and it is upon these suppositions of the child, that this claim is based.   While this testimony, if testimony it can be called, adds no weight to the facts upon which an inference might be drawn, that the deceased did in fact step from the cage into the doorway, it does disclose negligence of the operator of the elevator, as the motive or incentive to the act if it was done, in incorrect information given to the deceased as to the locality of the cage at the time.   And when it is remembered that the sole operator and manager of this dangerous machine, rendered more than ordinarily hazardous by reason of its structure, and running at midnight in a shaky and jerky manner, was a colored boy aged about fifteen or sixteen years, if anything more were needed, this testimony would seem to furnish supplementary proof of the triad of negligent causes alleged in the petition to have produced the boy's death, whatever bearing it may, or ought to have, upon the question of contributory negligence.   That on such evidence it should be declared as matter of law that he was guilty of contributory

negligence, is unreasonable, and wholly unwarranted by principle or precedent. As we have hitherto held, and as has been held by the St. Louis Court of Appeals, and by three circuit judges, so we do now again hold, that the evidence made a proper case for the plaintiff to be submitted to the jury.

(2)  In the statement has been set out all the questions propounded to the witness Brislin who qualified as an expert in the construction of elevators, to which answers were not permitted, and exceptions saved.  Some like questions were asked other non-expert witnesses, but in no instance was offer made of any proof by any of these witnesses.  Without going into detail, it is sufficient to say, in answer to the contention that the judgment should be reversed for the refusal of the court to permit answers to these questions—that after a careful consideration of the action of the court in this behalf, we fail to find any error for which the judgment should be reversed.  The evidence sought to be elicited by these questions was either the opinions of witnesses about matters of common knowledge, or of which the jurors were just as capable of framing an opinion as the witnesses, or the opinions of the witnesses upon issues which it was the province of the jury to try and determine.  The witnesses were permitted in every instance to detail all the facts within their knowledge touching the matter being inquired about, and it does not appear that any answers would have been returned to any of these questions, had answers thereto been permitted, that would have changed the result.

(3)  It is contended for the defendant that the court by giving instruction number 1, for the plaintiff and refusing to give instruction number 8 for the defendant, required the exercise of too great a degree of care upon the plaintiff in the operation of its elevator.  The rule upon this subject as laid down in the latest publication at hand, is as follows:  "A carrier by elevator is not an insurer, but is re-

quired to exercise the highest degree of care in everything calculated to insure the safety of his passengers. There is no distinction in law between the duties and liabilities of a carrier by elevator and one by railroad. Each is bound to the use of the utmost care and skill in the choice and maintenance of machinery and appliances, and the selection of operatives, and the liability of both for the slightest negligence of an operative, irrespective of the care with which he may have been selected, resulting in damages to a passenger, is in its last analysis, identical." [10 Am. & Eng. Ency. of Law (2 Ed.), p. 946]. In the notes to the text on that and the following pages, many cases are cited and quoted from in support of this rule, and others are cited in the brief of counsel for respondent. We have found none maintaining that a less degree of care should be required, and as that required by the ruling of the trial court on these instructions is well within this rule, no error was committed in this behalf.

(4) The point made against the action of the court in refusing to give defendant's instructions No. 1, 2, A. and 10 and in modifying instruction No. 2, as hereinbefore stated, is, that its effect "was to allow plaintiff to recover, even though the accident happened in a way different from that set out in plaintiff's petition. Plaintiff alleged that deceased was caused to be thrown or fall from the elevator, and this instruction (as modified) allows plaintiff to recover if deceased stepped or jumped from the elevator."

This contention in effect concedes that instruction No. 1, A. and 10 were covered by instruction No. 2 for defendant, as asked, and if that instruction had been given as asked, there would then have been no ground for this complaint, and the argument is directed at the modified instruction. This instruction did not authorize a recovery at all. It was in effect an instruction for the defendant, based upon its plea of contributory negligence, and such evidence as there was to support it, and predicated a state of facts upon which the

jury were authorized to deny a recovery. But neither this instruction nor any other given in the case, authorized a recovery unless the jury found from the evidence that the death of the boy was caused by some or all the acts of negligence charged in the petition. It was not essential to plaintiff's cause of action to state the mode in which these causes operated, in producing the fatal result, and certainly the defendant could not create a departure for the plaintiff by predicating for the purposes of its defense a different theory of the manner in which the boy's death was produced from that stated in the petition. Nor could the action of the court in requiring that such theory should be consistent with the boy's negligence, have that effect. We fail to find any merit in this contention.

(5) This action was properly brought under section 4426, Revised Statutes 1889. No complaint is made of the instruction of the court on the measure of damages, and there is nothing in the amount of the verdict to even suggest that it was the result of partiality, passion or prejudice, and the judgment thereon should be affirmed. It is accordingly so ordered.

All concur.